# EXHIBIT A

STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF HENNEPIN                                   FOURTH JUDICIAL DISTRICT
                                                          Case Type: Other/Civil

---

Evelyn Ireland,                              Court File No: _____
                                             Judge: _____
         Plaintiff,

v.
                                                       **SUMMONS**
Lear Capital, Inc.,
Lear Financial, Inc.,
Joanne Verbon,
Bradford Kaye,

         Defendants.

---

THIS SUMMONS IS DIRECTED TO DEFENDANTS ABOVE-NAMED:

   1.   **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

   2.   **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

         Kevin S. Sandstrom, Esq.
         Eckberg, Lammers, Briggs, Wolff & Vierling, P.L.L.P.
         1809 Northwestern Avenue
         Stillwater, MN 55082

   3.   **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

   4.   **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to

respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: 8/15/12

ECKBERG, LAMMERS, BRIGGS,
WOLFF & VIERLING, P.L.L.P.

By: /s/ Kevin S. Sandstrom
Kevin S. Sandstrom, Esq. (#348958)
1809 Northwestern Avenue
Stillwater, MN 55082
(651) 439-2878
Attorney for Plaintiff

2

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |
| | Case Type: Other/Civil |

| | |
|---|---|
| Evelyn Ireland, | Court File No: _____ |
| | Judge: _____ |
| Plaintiff, | |
| v. | |
| Lear Capital, Inc., | **COMPLAINT** |
| Lear Financial, Inc., | |
| Joanne Verbon, | |
| Bradford Kaye, | |
| Defendants. | |

Plaintiff, Evelyn Ireland, for her Complaint against the Defendants Lear Capital, Inc., Joanne Verbon, and Bradford Kaye, states and alleges as follows:

## THE PARTIES

1. Plaintiff, Evelyn Ireland (hereinafter referred to as "Plaintiff") resides at 6501 Woodlake Drive, #517, Richfield, MN 55423.

2. Upon information and belief, Defendant Lear Capital, Inc. is a California corporation with its principal place of business at 1990 S. Bundy Drive, Suite 600, Los Angeles, CA 90025.

3. Upon information and belief, Defendant Lear Financial, Inc. is a California corporation with its principal place of business at 429 Santa Monica Blvd., Santa Monica, CA 90401.

4. Upon information and belief, Lear Capital, Inc. is a successor in interest or an alter ego of Lear Financial, Inc.,

5. Upon information and belief, Lear Financial, Inc. simply changed its name to Lear Capital, Inc.

6. Hereinafter, Lear Capital, Inc. and Lear Financial, Inc. shall be collectively referred to as "Lear Capital."

7. Upon information and belief, Defendant Joanne Verbon is an employee of Lear Capital and resides at 6487 Cavalleri Road, Apt. 231, Malibu, CA 90265.

8. Upon information and belief, Defendant Bradford Kaye is an employee of Lear Capital and resides at 18000 Coastline Drive, Apt. 5, Malibu, CA 90265.

9. Lear Capital, Joanne Verbon, and Bradford Kaye shall be collectively referred to hereinafter as "Defendants."

## JURISDICTION AND VENUE

10. The Minnesota courts have personal jurisdiction over Defendants based upon their contacts and dealings with Plaintiff while she was a resident of Minnesota.

11. The Minnesota courts have personal jurisdiction over Defendants based upon the fact that Lear Capital maintains agents, representatives, and/or employees in Minnesota, including but not limited to David Engstrom, who writes articles and blogs on behalf of Lear Capital for purposes of promoting its services.

12. The Minnesota courts have personal jurisdiction over Defendants based upon the fact that Lear Capital engages in significant advertising within Minnesota that is directed at Minnesota residents, including but not limited to advertisements appearing on Minnesota-based media websites, including but not limited to: www.minnesota.cbslocal.com, www.Kare11.com, and www.92kqrs.com.

13. Venue is proper in Hennepin County because Plaintiff resides in Hennepin County and some of Defendants dealings with Plaintiff at issue in this matter occurred while Plaintiff was residing in Hennepin County, Minnesota.

## FACTS COMMON TO ALL COUNTS

14. Based upon general discussions in the news media during the early to mid 2000s about the rising price of gold, Plaintiff decided that it would be a good idea for her to invest in gold.

15. Plaintiff learned about Defendants' business and their ability to assist people with investing in gold from hearing Defendants' advertisements and promotions on the Art Bell radio show during the 2004 timeframe.

16. In or about late 2004, Plaintiff decided she would liquidate one of her retirement accounts in the amount of approximately $170,000.00 and provide the funds to Defendants to invest in gold.

17. Plaintiff contacted Defendants via telephone and spoke to Joanne Verbon on two or three occasions in late 2004. Ms. Verbon was friendly and folksy with Plaintiff, and Plaintiff liked her. As a result, Plaintiff decided to buy gold through Defendants.

18. When Plaintiff spoke with Ms. Verbon in late 2004, Ms. Verbon recommended that Plaintiff invest her $170,000.00 in rare "numismatic" gold and silver coins as a superior investment as compared to regular gold bullion.

19. Based upon Defendants' recommendation, in or about late 2004, Plaintiff turned over her $170,000.00 in retirement funds to Defendants, and asked Defendants to purchase gold coins for her, with the particular gold coins being selected by Defendants.

20. At the time she decided to purchase the numismatic coins from Defendants, Plaintiff was 81 years old.

21. In exchange for Plaintiff's $170,000.00, on or about January 4, 2005, Defendants sold the following "numismatic" gold and silver coins to Plaintiff, and charged Plaintiff the following prices:

| Qty | Date | Description | Grade | Price/coin | Price Ext |
|---|---|---|---|---|---|
| 2 | VAR | $10 INDIAN | MS62 | $575.00 | $1,150.00 |
| 17 | VAR | $5 INDIAN | MS63 | $2,170.00 | $36,890.00 |
| 31 | VAR | $10 LIBERTY | MS63 | $1,225.00 | $37,975.00 |
| 16 | VAR | $20 LIBERTY | MS64 | $2,310.00 | 36,960.00 |
| 10 | VAR | $5 LIBERTY | MS64 | $2,135.00 | $21,350.00 |
| 192 | VAR | $1 MORGAN | MS64 | $55.00 | $10,560.00 |
| 10 | VAR | $20 ST. GAUDENS | MS65 | $1,990.00 | $19,950.00 |
| 2 | VAR | $20 ST. GAUDENS | MS66 | $2,600.00 | $5,200.00 |
| | | | | **TOTAL:** | **$170,035.00** |

22. Upon information and belief, Defendants grossly inflated and overvalued the coins that they sold to Plaintiff, and did not tell Plaintiff that fact.

23. Upon information and belief, as of January 4, 2005, the price of gold bullion was approximately $426.00 per ounce.

24. In the months and years following her purchase of gold and silver coins, Plaintiff continued to hear news reports about the skyrocketing price of gold and silver. Plaintiff

regularly called Defendants, particularly Joanne Verbon, in an attempt to inquire of Ms. Verbon how much the value of her coins had risen.

25. Whenever Plaintiff called Ms. Verbon to inquire, Ms. Verbon pushed her off, stating that she was busy, that Plaintiff's coins were difficult to value, and that Ms. Verbon did not have time to assist Plaintiff in determining the present market value of her coins. Plaintiff was not able to obtain any information from Defendants regarding the present market value of her coins after she had purchased them.

26. In or about 2006, Plaintiff moved from Indian Wells, California to Richfield, Minnesota.

27. In or about December 2009, Ms. Verbon called Plaintiff out of the blue, and told Plaintiff that she recommended, as a prudent investment move, that Plaintiff exchange many of her existing gold coins (the ones purchased from Defendants in 2005) for a new and different type of gold coin. Ms. Verbon did not discuss the details of the value of Plaintiff's existing coins or the proposed new coins.

28. On or about December 18, 2009, based upon Defendants advice and recommendation, Plaintiff agreed to sell approximately 79% of her existing coins for a price of $149,089.00. In return, on or about January 4, 2010, Defendants then purchased for Plaintiff a new set of 89 x "$20 St. Gaudens" gold coins for a price of $149,046.52.

29. Notably, as of December 18, 2009, the price of gold bullion had risen to approximately $1,112.00 per ounce, and as of January 4, 2010, had risen again to over $1,120.00 per ounce.

30. Plaintiff continued to try to contact Defendants over the years to inquire about the increase in value of her gold coins, but Ms. Verbon always gave her the run around and would not give Plaintiff a valuation.

31. In or about July of 2011, Plaintiff continued to hear news media reports about the escalating price of gold. Given Defendants unresponsiveness, she decided to speak to a local Twin Cities gold and silver coin dealer about the value of her coins. Upon describing the particular quantities and names/descriptions of Plaintiff's gold and silver coins, the local gold and silver coin dealer informed Plaintiff that the approximate market value of her entire collection was only $140,000.00.

32. Plaintiff was extremely distressed and dismayed to hear that her coin holdings were valued at only $140,000.00 in 2011, when she had invested $170,000.00 back in 2006.

33. Notably, as of late July 2011, the price of gold bullion was approximately $1,620.00 per ounce. Thus if Plaintiff had invested her original $170,035.00 in gold bullion back in 2005 when the gold price was just $426.00 per ounce, then her investment should have been worth approximately $646,000.00 as of July 2011.

34. After speaking to the local coin dealer, Plaintiff immediately called Defendants to raise her serious concerns. Plaintiff told Ms. Verbon what the local coin dealer had stated, and Ms. Verbon told Plaintiff that the local dealer simply could not be correct and that Ms. Verbon would now research the value of Plaintiff's gold coins and get back to her shortly.

35. Approximately 30 minutes later, Ms. Verbon called Plaintiff back and stated that she had good news, that Plaintiff's gold coins were actually "worth $180,000.00." Ms. Verbon then excited stated to Plaintiff: "Isn't that wonderful!?"

36. Plaintiff then indicated to Ms. Verbon that a valuation of only $180,000.00 was absolutely unacceptable given that the price of gold had risen enormously since her original investment of $170,000.00 back in 2005.

37. Ms. Verbon then offered to have Plaintiff speak to her supervisor, Bradford Kaye. When Mr. Kaye later spoke with Plaintiff on the phone, he told Plaintiff that her coins were worth $190,000.00 in a blatant attempt to appease Plaintiff. To be sure, Plaintiff was not pleased.

38. On July 29, 2011, Defendants sent Plaintiff a letter outlining the purported value of the gold coins she currently held, placing the values as follows:

| Qty | Description | Price | Total |
| --- | --- | --- | --- |
| 192 | $1 MORGAN MS 64 | $79.00 | $15,168.00 |
| 89 | $20 ST. GAUDENS AU | $1,675.00 | $149,075.00 |
| 10 | $20 ST. GAUDENS MS 65 | $2,092.00 | $20,920.00 |
| 2 | $20 ST. GAUDENS MS66 | $2,820.00 | $5,640.00 |
| | | **TOTAL** | **$190,803.00** |

39. Notably, the bulk of Plaintiff's investment coins were then held in the 89 X "$20 St. Gaudens AU" coins purchased via Defendants on January 4, 2010. The purported market value of those coins proffered by Defendants on July 29, 2011 is virtually identical to the price at which Plaintiff purchased the coins from Defendants on January 4, 2010, despite the fact that in the mere 19 months from January 4, 2010 to July 29, 2011, the price of gold bullion rose from $1,120.00 per ounce to $1,620.00 per ounce.

40. Plaintiff then contacted her nephew, Christopher Zwettler, to assist her in investigating what went wrong with her investment with Defendants.

41. Mr. Zwettler researched the valuation of "numismatic" gold and silver coins, and discovered that a reference material called the "Official Red Book of United States Coins" (hereinafter the "Red Book") exists to assist in valuing rare gold and silver coins.

42. Utilizing the Red Book for year 2004, Mr. Zwettler was able to estimate that the numismatic coins that Defendants sold to Plaintiff on January 4, 2005 for $170,035.00 had an actual market value of approximately $89,800.00 at the time Defendants sold them to Plaintiff.

43. Utilizing the Red Book for year 2009, Mr. Zwettler was able to determine that the gold coins that Defendants sold to Plaintiff on January 4, 2010 for $149,089.00 had an actual market value of approximately $86,775.00 at the time Defendants sold them to Plaintiff.

44. Utilizing the Red Book for year 2011, Mr. Zwettler was able to determine that the approximate market value of Plaintiff's coins as of July 2011 was only $179,000.00.

45. In early August, 2011, Mr. Zwettler on Plaintiff's behalf confronted Defendants with the foregoing information and demanded more information from Defendants as to the "mint marks" of the coins Defendants originally purchased for Plaintiff in 2005 and then took back from Plaintiff in 2009. Mr. Zwettler also demanded information regarding the methods Defendants utilized to determine the value of the coins they sold to Plaintiff in 2005 and 2010. Defendants refused to provide such information to Mr. Zwettler or Plaintiff.

46. Defendants intentionally misrepresented and overvalued the coins they sold to Plaintiff in both January 2005 and January 2010 in order to defraud Plaintiff of her funds.

47. Even as of June and July 2010, gold prices continue to fluctuate at or around $1,600.00 per ounce.

## COUNT I
## FRAUD AND INTENTIONAL MISREPRESENTATION

48. Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

49. Defendants made multiple false statements of past or existing material facts to Plaintiff regarding the value of the coins they sold to Plaintiff.

50. Defendants made false statement of past or existing material facts to Plaintiff that investing in rare "numismatic" coins was a superior financial investment as compared to gold bullion or other investments.

51. Defendants knew or should have known their statements to Plaintiff were false and/or they made the representations with reckless disregard as to whether they were true or false.

52. Defendants made the false statements to Plaintiff intending that Plaintiff would act in reliance on them.

53. Plaintiff relied upon Defendants' expertise, knowledge, and their false statements of fact in deciding to initially purchase coins and then to exchange/repurchase more coins from Defendants.

54. Plaintiff was harmed by Defendants conduct, inasmuch as she would not have purchased the coins from Defendants at Defendants' quoted prices if she had known of Defendants' false statements.

55. Plaintiff has incurred and will continue to incur substantial damages as a result of Defendants' conduct, in an amount in excess of $50,000.00, to be more specifically proven at trial.

## COUNT II

## CONSUMER PROTECTION VIOLATIONS

56. Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

57. The actions of Defendants constitute the use or employment of fraud, false pretense, false promise, misrepresentation, misleading statement and deceptive practices, with the intent that Plaintiff would rely thereon, in connection with Plaintiff's purchase and exchange/repurchase of coins from Defendants.

58. Plaintiff did act in reliance upon Defendant's deceptive practices, and Defendants conduct had a substantial part in bringing about Plaintiff's injury.

59. The conduct of Defendants constitutes a violation of Minn. Stat. § 325F.69, subd. 1.

60. Plaintiff has a right to bring a private action for violation of § 325F.69 by virtue of the provisions of Minn. Stat. § 8.31, subd. 3a.

61. Plaintiff is a "senior citizen" as defined in Minn. Stat. § 325F.71 for purposes of a civil action for violation of § 325F.69.

62. As a senior citizen, Plaintiff has a right to bring a private action for violation of § 325F.69 by virtue of Minn. Stat. § 325F.71, subd. 4.

63. Defendants knew or should have known that Plaintiff was a senior citizen.

64. Defendants conduct caused Plaintiff to suffer a substantial loss of property set aside for retirement, personal care, and family care purposes.

65. Plaintiff was more vulnerable to Defendants' conduct due to her age.

66. Plaintiff has incurred and will continue to incur substantial damages as a result of Defendants' conduct.

67. In addition to her actual damages, Plaintiff is entitled to recover statutory civil penalties, her costs, disbursements, and reasonable attorneys' fees, and other equitable relief against Defendants as set forth in Minn. Stat. § 325F.71.

68. As a result of Defendant's consumer protection law violations, Plaintiffs request and are entitled to judgment against Defendant in an amount in excess of $50,000, to be more specifically proven at trial, plus statutory penalties, interests, costs, and reasonable attorneys' fees pursuant to applicable law.

## COUNT III
## BREACH OF FIDUCIARY DUTY

69. Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

70. Defendants represented themselves to Plaintiff as experts with superior knowledge in rare numismatic gold and silver coins. Indeed, Defendants do have superior knowledge than Plaintiff regarding investing in gold and silver coins.

71. Defendants represented to Plaintiff that investing in numismatic gold and silver coins was a superior and more prudent investment than standard gold bullion or other financial investment tools.

72. Defendants represented that they were acting in Plaintiff's best interest and for her benefit.

73. Plaintiff placed her trust in and relied upon Defendants to assist her in wisely investing her retirement funds.

74. Defendants knew or should have known that Plaintiff was placing her trust and reliance upon them to act in her best interests.

75. Defendants owed fiduciary duties of loyalty, honesty, good faith and fair dealing to Plaintiff to assist her in making a sound investment at a fair price and to act in Plaintiff's best interest.

76. Defendants breached their fiduciary duties to Plaintiff by selling her gold and silver coins at vastly overinflated, fraudulent prices to Plaintiff's detriment and to Defendants' sole benefit.

77. Plaintiff has suffered substantial damages as a direct and proximate result of Defendants' breaches of fiduciary duty, in an amount in excess of $50,000.00, to be more specifically proven at trial.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78. Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

79. Plaintiff had a reasonable expectation of a significant economic advantage, benefit and profit by her intent to invest in gold in the late 2004 to early 2005 timeframe.

80. Defendants knew that Plaintiff intended to benefit by investing in gold in the late 2004 to early 2005 timeframe.

81. Defendants wrongfully, unjustifiably, and intentionally interfered with Plaintiff's expected economic advantage, benefit and profit by convincing Plaintiff to invest in numismatic coins at grossly overinflated prices.

82. Plaintiff had a reasonable probability, and indeed a virtual certainty, of obtaining a substantial economic advantage, benefit, and profit by investing in gold in the late 2004 to early 2005 timeframe if Defendants had not interfered.

83. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial damages and lost profits in excess of $50,000.00, to be proven with greater specificity at trial.

WHEREFORE, the Plaintiff requests the following relief from this Court:

1. Judgment in favor of the Plaintiff and against Defendants for her damages incurred, in an amount in excess of $50,000.00, to be proven with specificity at trial;

2. For an award of pre-judgment interest on all damages incurred;

3. For an award of statutory penalties against Defendants;

4. For an award of Plaintiffs' costs, disbursements, and reasonable attorneys' fees; and

5. For any other legal or equitable relief this Court deems just and appropriate.

Dated: 8/15/12

ECKBERG, LAMMERS, BRIGGS, WOLFF & VIERLING, P.L.L.P.

By: /s/ Kevin S. Sandstrom
Kevin S. Sandstrom, Esq. (#348958)
1809 Northwestern Avenue
Stillwater, MN 55082
(651) 439-2878
Attorney for Plaintiffs

## ACKNOWLEDGMENT

Pursuant to Minn. Stat. §549.211 (1) and (3), the party or parties represented by the undersigned attorneys acknowledge(s) that costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties for actions in bad faith; the assertion of a claim or a defense that is frivolous and that is costly to the other party; the assertion of an unfounded position solely to delay the ordinary course of the proceedings or to harass; or the commission of a fraud upon the Court.

Dated: 8/15/12

ECKBERG, LAMMERS, BRIGGS,
WOLFF & VIERLING, P.L.L.P.

By: /s/ Kevin S. Sandstrom

Kevin S. Sandstrom, Esq. (#348958)
Attorney for Plaintiffs